# Transcript of the Testimony of

# Shawn Burgess

**Date:** July 21, 2021

**Case:** Lavetta Stevenson v. Pulaski County Special School District

**Bushman Court Reporting**
Ashley Telaga
Phone: (501) 372-5115
Fax: (501) 378-0077
<www.bushmanreporting.com>

**EXHIBIT 4**

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

MS. APRIL RHEAUME
SANFORD LAW FIRM, PLLC
KIRKPATRICK PLAZA
10800 FINANCIAL CENTRE PKWY, SUITE 510
LITTLE ROCK, ARKANSAS 72211
(800) 615-4946
april@sanfordlawfirm.com

ON BEHALF OF THE DEFENDANT:

MR. CODY KEES
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 WEST CAPITOL AVENUE, SUITE 3200
LITTLE ROCK, ARKANSAS 72201-3469
(501) 374-1107
ckees@bbpalalw.com

Page 4

1           CAPTION
2     ANSWERS AND ORAL DEPOSITION OF SHAWN BURGESS, a witness
3   produced at the request of the Plaintiff, taken in the above-
4   styled and numbered cause on the 21st day of July, 2021, at
5   11:03 a.m., via Zoom in Arkansas, pursuant to the Federal Rules
6   of Civil Procedure.

Page 3

INDEX

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . . . . . 4

WITNESS: SHAWN BURGESS

   Examination by MS. APRIL RHEAUME . . . . . . . . . . . 5

   Deposition Concluded . . . . . . . . . . . . . . . 52

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . . 53

EXHIBITS:              IDENTIFIED:

1. . . . . . . . . . . . . . . . . . . . . . . . 7

Page 5

1              PROCEEDINGS
2       THEREUPON,
3              SHAWN BURGESS,
4         THE WITNESS HEREINBEFORE NAMED, having
5    been first duly cautioned and sworn by me
6    to testify to the truth, the whole truth,
7    and nothing but the truth, testified on her
8    oath as follows, to-wit:
9              EXAMINATION
10
11         MS. RHEAUME:  Thank you.  I hear some echo.
12    I think we're good now.  So sorry.
13
14  BY MS. RHEAUME:
15  Q  Ms. Burgess, thank you for being here today.  Am I correct
16  that you are the assistant supervisor of HR?
17  A  **Assistant superintendent for human resources.**
18  Q  Yes, I'm so sorry.
19  A  **That's okay.**
20  Q  I'm going to do my best to ask some good questions today.
21  That doesn't always happen, so please feel free to tell me that
22  I had a bad question and I should re-ask it or ask me if you
23  don't understand the question.  I just really want to make sure
24  that you and I are on the same page so I get your -- your
25  answers accurate.  I'm going to do my best not to talk over

2 (Pages 2 to 5)

1  Q    Okay.

2  **A    On the other hand, it's not, quote, unquote, termination,**

3  **per se, but we have what we call temporary employees or sub**

4  **employees.  And those are at-will employees, so depending on**

5  **the specific job that they were recommended to do, we can**

6  **utilize them or not based on the needs at that time.  So it's**

7  **not, quote, unquote, termination.  It's about using them during**

8  **the period in which they were needed.**

9  Q    And when it comes to the at-will employees, where you have

10 some policy where you utilize them or not based on the need,

11 your discrimination policies still apply there; is that

12 correct?

13 **A    I wouldn't say that -- what do you mean by that?  Can you**

14 **rephrase that in a different manner?**

15 Q    So if you have several employees who are temp employees

16 and you only need one, how do you choose which one?

17 **A    Okay.  That's good.  Okay.  So it depends on -- I'm going**

18 **to give you just a simple scenario.  So let's say that -- I'm**

19 **going to give you two, actually.  One, if we've hired a**

20 **temporary employee for a position because of COVID, because we**

21 **hired lots of temps for COVID because -- in an effort to**

22 **supervise smaller groups of students.  So -- but there came a**

23 **time when we learned that we could bring more students back, if**

24 **the parents wanted them to come back on site, so -- and they**

25 **didn't have to be as far apart, so we didn't have to utilize as**

Page 46

1  Q   How does termination work, because I'm sure there's a lot
2  -- well, let me ask this.
3  Is there a lot of paperwork involved in termination?
4  A   It can be.  Yes.
5  Q   What kinds of records do you need to create or edit when
6  an individual is terminated?
7  A   That's -- that's where it comes with the progressive
8  discipline and making sure that the employee has been supported
9  prior to this happening.  And, so, that's why if, by chance,
10 there's a situation where a supervisor feels like that they
11 need to recommend termination, they will, even before they meet
12 with the employee, they will bring it or call us and say, hey,
13 I need for you to take a look at, you know, this particular
14 documentation that I've had to see if I have enough to
15 recommend termination or do I need to do something different?
16 That's if it's not egregious.
17 And, so -- and then sometimes we look at it and say, hey, not
18 really sure.  Let me shoot it over to the attorneys, and then
19 they'll take a look and see if it's something that we need to
20 support this employee more on and -- or if it's something that
21 we can proceed with.
22 Q   Are you to able to tell me whether or not your office
23 looked at Ms. Steveson's file and created that inquiry?
24 A   Well, based on Ms. Steveson's file, she was a temporary
25 security officer, so there is not a termination recommendation

Page 47

1  for that because that's an at-will position.
2  Q   So the terminations for temp employees only get to your
3  office after the termination happens?  Or do they not go to
4  your office at all?
5  A   Okay.  You're going to have to clarify that one.
6  Q   So when a termination happens for a temporary employee,
7  who gets notice that the termination happened?
8  A   So they're not necessarily terminated, that's what I'm
9  saying, if they stop using them.  Okay.  Let me give you an
10 example, like, even from my office.  I have a person -- I've
11 used persons for filing because, of course, in HR there are
12 lots and lots of papers.  So when the ladies in my office get
13 behind, I will call Jane Doe and say, hey, are you available
14 this week to come up and file for our office?  And they'll say,
15 Yes.  So then I will have that person to come and file.  And
16 then once that person has done the duties that's needed, then
17 I'll say, thank you, and they don't come back -- it's not a
18 termination.  I just use them as needed, and that's the same
19 type of position that Ms. Steveson was providing.  And, so, if
20 I need that person again in another month, I'll call them back
21 and say, hey, can you come back up and help with whatever we
22 have going on in the office?  And they'll work a week or two,
23 and then they go back home or go do whatever they're doing.
24 But it's not a termination.  It's utilizing them in the manner
25 that we need them at that time.

Page 48

1  Q   So they're employed indefinitely?
2  A   Well, it's not indefinitely.  It's as needed.  And, so,
3  each school year, like I mentioned before, our school year runs
4  -- or fiscal year runs from July 1st to June 30th.  So if I
5  bring this person in this month, in July, and I need them to
6  work now and I may need them to work again in September, so
7  they're not working every day.  They're only working on an
8  as-needed basis.  And let's say I stop using them in December.
9  It's okay.  It's not a termination.  I just hadn't used them
10 anymore.  It's really a (inaudible) type situation.  They're
11 just filling job duties as needed at that time.
12 Q   Are they classified as hourly -- hourly paid employees?
13 A   They are temporary hourly employees.  That's exactly
14 right.
15 Q   Okay.  So they're given a W-2?  Not a 1099?
16 A   They're given a W-2, I think.  I'm going to say that
17 loosely.  I believe they are given a W-2, I believe.
18 Q   You can say that you don't know.  We can find out later.
19 A   Yeah.  I don't know.  However, we do have some people that
20 were paid on 1099s, so it just depends on what they're doing.
21 Q   Okay.  You told me earlier that non-discrimination
22 policies will still apply to temp employees; isn't that right?
23 A   Yes.  I mean definitely we're going to follow the law.
24 Q   Ms. Burgess, how extensively did you review Ms. Steveson's
25 situation prior to this deposition?

Page 49

1  A   I reviewed her personnel file prior to it.  I mean I saw
2  some information I guess she had submitted to her supervisor or
3  to our office concerning some work notes.  I mean her file is
4  pretty simplistic, because she wasn't -- didn't work much from
5  what I could see.  I don't have her day-to-day, as far as how
6  many days she worked, but I do see where she completed the
7  necessary pieces when she was brought on to be set up for pay.
8  And I saw, like, three doctor's notes, and that's about the
9  extent of her -- it's very thin, so, because she didn't work
10 very much.  And then, of course, the unemployment pieces that
11 we discussed earlier where she filed for unemployment.  That
12 was probably the extent of her personnel file.
13 Q   Okay.  Thanks.  Do you have a personal opinion on the
14 merits of this case?
15 A   I don't have a personal opinion.  I have a professional
16 opinion.  My professional opinion is that it was kind of like
17 the scenario I gave you earlier.  The position in which she
18 worked as a temporary security officer was on an as-needed
19 basis, and so -- and that's something that we utilize a lot,
20 based on the needs at the time, like I mentioned the scenario
21 about the COVID, and things of that nature.  So we bring in
22 persons, based on the needs of our students or then needs of
23 the district at the time, and we let them know, I need for you
24 to work a day, three days, five days, a week, whatever.
25 And, so, it's not a termination or discrimination on any

Page 50

1  manner, because that's not what we do.  We -- we utilize those
2  persons for the responsibilities needed at that time.
3  Q   And didn't you replace Ms. Steveson immediately after she
4  was terminated?
5  A   Well, she -- again, in my professional opinion, she wasn't
6  terminated.  And what happens is we keep a posting on our
7  applicant system for temp security officers so any time that
8  there's a need to fill, then they would either move somebody in
9  district to or they will go to that applicant system and they
10 will interview and find somebody else to bring in as a temp.
11 Q   So it's your testimony today that Ms. Steveson was not
12 terminated?
13 A   That's exactly right.
14 Q   So when Ms. Steveson asked to work and she was denied
15 that, what was the reason?
16 A   I don't have any documentation that she requested or was
17 denied to work.  I have no -- none of that is in her personnel
18 file.
19 Q   Isn't that the kind of thing that her immediate supervisor
20 would have to report on?
21 A   Well, the documentation that her supervisor reported was
22 the doctors notes that Ms. Steveson provided.  But if it's
23 something that needed to be clarified, the supervisor
24 definitely would reach out and ask for clarification if they
25 were unsure about any things going forward concerning her

Page 51

1  employment.
2  Q   So the doctor's note that Ms. Steveson provided that said
3  that she was able to return to work on March 25th, was that in
4  her personnel file?
5  A   It is.
6  Q   And Ms. Steveson showed up for work on March 25th; is that
7  right?
8  A   I don't know.
9  Q   You don't know.  Okay.  And Ms. Steveson's father was
10 hired to replace Ms. Steveson; is that right?
11 A   I don't know that either.
12         MS. RHEAUME:  I think I'm nearly done here.
13     Can I have 5 to 10 minutes?  Are you all okay
14     with that?
15         THE WITNESS:  Yes.
16         MS. RHEAUME:  All right.  Thanks.
17         (BREAK TAKEN)
18         MS. RHEAUME:  All right.  I just want to be
19     back on the record to say that I do not have
20     any further questions, and I pass it to Mr.
21     Kees, if he wants to do so.
22         MR. KEES:  Yeah.  Can you hear me from
23     here?
24         MS. RHEAUME:  I can.
25         MR. KEES:  I just have one, so if you can

Page 52

1  hear me, this will be fine.
2  CROSS-EXAMINATION
3
4  BY MR. KEES:
5  Q   Ms. Burgess, can Ms. Steveson still work for the district,
6  in some capacity, as we sit here today?
7  A   Yes, she can.
8  Q   And has that -- was that the case in 2019?
9  A   Yes.  There's nothing in her file that tells me that she
10 can't.  Nothing.  I mean nothing derogatory at all.
11
12         MR. KEES:  Okay.  That's all I have.
13     Anything further?
14         MS. RHEAUME:  I don't have anything
15     further.
16         MR. KEES:  Okay, all right.  Do you have
17     anything else for me today?
18         MS. RHEAUME:  Good on my end.
19         MR. KEES:  Okay.
20         THE COURT REPORTER:  I think I'm good too.
21         MS. RHEAUME:  Thank you, everyone, for
22     being here in the middle of the day.
23         (WHEREUPON, the proceedings were concluded in
24     the matter at 12:45 p.m.)
25         (WITNESS EXCUSED)

Page 53

C E R T I F I C A T E

STATE OF ARKANSAS   )
                    )ss
COUNTY OF LONOKE    )

    I, ASHLEY TELAGA, Certified Court Reporter #841, does
hereby certify that the facts stated by me in the caption on
the foregoing proceedings are true; and that the foregoing
proceedings were reported verbatim through the use of the
voice-writing method and thereafter transcribed by me or under
my direct supervision to the best of my ability, taken at the
time and place set out on the caption hereto.
    I FURTHER CERTIFY, that I am not a relative or employee of
any attorney or employed by the parties hereto, nor financially
interested or otherwise, in the outcome of this action, and
that I have no contract with the parties, attorneys, or persons
with an interest in the action that affects or has a
substantial tendency to affect impartiality, that requires me
to relinquish control of an original deposition transcript or
copies of the transcript before it is certified and delivered
to the custodial attorney, or that requires me to provide any
service not made available to all parties to the action.
    WITNESS MY HAND AND SEAL this 6th day of August, 2021.
    _____
    ASHLEY TELAGA, CCR, CVR
    Certified Court Reporter #841